UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LA TOYA  GRAHAM, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-1410 |
| | § | |
| JPMORGAN CASE BANK, NATIONAL | § | |
| ASSOCIATION, | § | |
| | § | |
| Defendant. | § | |

OPINION AND ORDER

The above referenced cause was removed from state court based on federal question

jurisdiction and consolidated with a nearly identical case, H-13-1412, also removed on federal

question grounds, which together allege disparate-treatment race discrimination, harassment,

hostile work environment, and retaliation in employment in violation of Title VII of the Civil

Right Act of 1964, of 42 U.S.C. § 2005(e), *et al.*, of Title 42 U.S.C. § 1981, and of the Texas

Commission on Human Rights Act ("TCHR"), § 21.051 of the Texas Labor Code, along with

Texas state common-law claims for invasion of privacy and intentional infliction of emotional

distress.  Pending before the Court is Defendant JPMorgan Chase Bank, National Association's

("Chase's") motion for summary judgment (instrument #24).

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when,

viewing the evidence in the light most favorable to the nonmovant, the court determines that "the

pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence

would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence.  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial."  *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at

712-13.

Substantive Law

I.  Title VII

A.  Disparate Treatment

Under section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1) and (2), it is "an unlawful

employment action for an employer . . . (1) to fail or refuse to hire or to discharge any individual,

or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment because of such individual's race, color, religion, sex, or

national origin; or (2) to limit, segregate, or classify his employees or applicants for employment

in any way which would deprive or tend to deprive any individual of employment opportunities

or otherwise adversely affect his status as an employee, because of such individual's race, color,

religion, sex or national origin."

Under the statute, suit may be brought under two distinct theories of discrimination,

disparate treatment and disparate impact.  *International Brotherhood of Teamsters v. United

States*, 431 U.S. 324 (1977); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006), *cert. denied*,

549 U.S. 888 (2006).   Title VII expressly prohibits both (1) intentional discrimination based on

race, color, religion, sex or national origin, known as "disparate treatment," as well as (2) an

employer's facially neutral practices that are discriminatory in operation against protected groups

(race, color, religion, sex or national origin) and not required by the nature of the job, known as

"disparate impact".  42 U.S.C. §§ 2000e-2(a)(1) and 2000e(k)(1)(A); *Ricci v. DeStefano*, 129 S.

Ct. 2658, 2672-73 (2009); *Pacheco*, 448 F.3d at 787.   The instant suit is one for disparate

treatment, which requires proof of discriminatory motive. *Pacheco*, 448 F.3d at 787.

1.  Exhaustion of Remedies

Plaintiffs claiming employment discrimination must exhaust administrative remedies by filing a timely charge with the EEOC and receiving a right-to-sue notice.  *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002).  Failure to exhaust administrative remedies "is not a procedural 'gotcha' issue," but "a mainstay of proper enforcement of Title VII remedies."  *McClain v. Lufkin Industries, Inc.*, 519 F.3d 364, 272 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 198 (2008).  A private plaintiff must exhaust her administrative remedies before seeking relief by filing an administrative charge with the EEOC.  42 U.S.C. § 2000e-(5)(b); *id.*

The filing of an administrative complaint about a claim under Title VII is a jurisdictional prerequisite.  *Tolbert v. U.S.*, 916 F.2d 245, 247 (5th Cir. 1990)(Exhaustion of administrative remedies in a Title VII suit is a prerequisite to federal subject matter Jurisdiction);  *Barnes  v. Levitt*, 118 F.3d 404, 408 (5th Cir. 1997), *cert. denied*, 523 U.S. 1136 (1998); *McCray v. DIP Indus., Inc.*, 942 F. Supp. 288, 294 (E.D. Tex. 1996)(The court's review is restricted to "'those grounds of a Title VII complaint that were raised in the administrative process.'"), *quoting Anderson v. Lewis Rail Serv. Co.*, 868 F.2d 774, 775 (5th Cir. 1989).[1]

---

[1]  The same is true of the TCHRA, Texas Labor Code § 21.202's 180-day time limit to file a charge with the TWC is mandatory and jurisdictional.  *Adams v. Cedar Hill ISD*, No. 3:13-CV-2598-D, 2014 WL 66488, at *4 n.10 (N.D. Tex. Jan. 8, 2014)(Although in *In re United Services Auto. Ass'n*, 307 S.W. 3d 299, 311 (Tex. 2010), the Texas Supreme Court held that the two-year statute of limitations for filing suit in an employment discrimination action, Tex. Labor Code Ann. § 21.256, is not jurisdictional, it did not hold that the 180-day deadline imposed by § 21.202, is not jurisdictional, and Texas courts of appeals have continued to hold that § 21.202 imposes a jurisdictional prerequisite to filing suit), *citing inter alia Forge v. Nueces County*, 350 S.W. 3d 740, 746 (Tex. App.--Corpus Christi 2011), no pet.).  *See also Lueck v. State*, 325 S.W. 3d 752, 758 (Tex. App.--Austin 2010, pet. denied)(holding that "unless and until the supreme court departs from its view" in *Schroeder* v. Texas Iron Works, Inc., 813 S.W. 2d 483, 486 (Tex. 1991)(*overruled on other grounds by In re United Services Auto. Ass'n*,), that the TCHRA "requires exhaustion of remedies, we will continue to treat the 180-dy filing requirement as 'mandatory and jurisdictional.'"); *Lueck v*. State, 325 S.W. 3d 752, 758 (Tex.  App.-Austin 2010, pet. denied); *Gonzalez v. Champion Technologies, Inc.*, 384  S.W. 3d 462, 471  (Tex.

Under Title VII, 42 U.S.C. § 2000e-5(e)(1), a charge of discrimination must be filed with the EEOC within 180 days after the occurrence of the alleged discriminatory practice unless the complainant has instituted proceedings with a state or local agency with the authority to grant of seek relief from unlawful employment practices, under which circumstances the period for filing such a charge with the EEOC is extended to 300 days. *Griffin v. City of Dallas*, 26 F.3d 610, 612 (5th Cir. 1994). In Texas, the qualifying state agency originally was the Texas Commission on Human Rights ("TCHR"). Effective March 1, 2004, the Texas Workforce Commission, Civil Rights Division, assumed the powers and duties of the TCHR. *Little v. Texas Dept. of Crim. Justice*, 148 S.W. 3d 374, 377-78 (Tex. 2004).

Plaintiff here did file a timely charge of race discrimination with the Equal Employment Opportunity Commission (#24-9, Ex. H) on October 14, 2012, but did not allege retaliation in it. She received her right-to-sue letter, dated February 14, 2013, and filed both state-court suits, asserting the various claims listed in the first paragraph of this Opinion and Order, on April 3, 2013.

2. Shifting Burden of Proof

A plaintiff may establish a claim of discrimination under Title VII by presenting direct evidence or by using the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence proves intentional discrimination without inference or presumption when believed by the trier of fact." *Jones v. Overnite Transportation Co.*, 212 Fed. Appx. 268, 272 (5th Cir. 2006), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Fierros v. Texas Dept. of Health*, 274

App.--Houston [14[th] Dist.] 2012, no pet.).

F.3d 187, 195 (5th Cir. 2001), *citing Portis v. National Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir, 1994); *Overnite Transportation*, 212 Fed. Appx. at 272.  If a plaintiff produces direct evidence of discrimination, he may "bypass the *McDonnell Douglas* burden-shifting framework [discussed *infra*] commonly applied in discrimination cases and proceed directly to the question of liability."  *Moore v. U.S. Dept. of Agric.*, 55 F.3d 991, 995 (5th Cir. 1995); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001); *Stone v. Parish of East Baton Rouge*, No. 08-31008, 2009 WL 2169122, *2 (5th Cir. July 20, 2009).  "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Fierros*, 274 F.3d at 192, *quoting Brown v. East Miss. Elec. Power Assoc.*, 989 F.2d 858, 861 (5th Cir. 1993).

Under the *McDonnell Douglas* framework, applied to circumstantial evidence cases, a plaintiff must first make a *prima facie* case of employment discrimination.  To establish a *prima facie* case of intentional discrimination under a disparate treatment theory Plaintiff must demonstrate that she "(1) is a member of a protected class (here that she is black and female); (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

An "adverse employment action for Title VII discrimination claims based on race, color, religion, sex, or national origin  "'include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'"  *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007), *quoting Green v. Administrator of Tulane Educ. Fund*, 284 F.3d

641, 657 (5th Cir. 2002). "Title VII was only designed to address 'ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir. 1999)(emphasis in original), *quoting Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.), *cert. denied,* 522 U.S. 932 (1997),(*abrogated on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). If an employer's action fails to have more than a "mere tangential effect on a possible future ultimate employment decision," it does not constitute an adverse employment action. *Mattern,* 104 F.3d at 708. To be actionable, an adverse employment decision must be a "tangible employment action that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764 (1998).

"[A] decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII." *Banks v. East Baton Rouge Parish School Board,* 320 F.3d 570, 575 (5th Cir. 2003), *citing Burger,* 168 F.3d at 878-80 (holding that an employer's refusal of an employee's request for a "purely lateral transfer" does not qualify as an adverse employment action under Title VII). By themselves, documented reprimands, though potentially affecting future employment decisions, do not qualify as adverse employment decisions. *Thompson v. Exxon Mobil Corp.,* 344 F. Supp. 2d 971, 981 (E.D. Tex. 2004), *citing Felton v. Polles,* 315 F.3d 470, 487 (5th Cir. 2002)(*abrogated on other grounds in retaliation cases only by Burlington N.*), and *Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 470 (5th Cir. 2002). The same is true of negative performance evaluations, even if they were not deserved. *Thompson,* 344 F. Supp. 2d at 981

(and cases cited therein). Disciplinary write-ups also fail to qualify as adverse employment actions. *Id.* at 982, *citing Mattern*, 104 F.3d at 707, and *Carthon v. Johnson Controls, Inc.*, 100 Fed. Appx. 993, 997 (5th Cir. 2004)(The employee's "receipt of a single disciplinary warning--without an attendant change in the terms or conditions of his employment--does not qualify as an ultimate employment decision.").

For the fourth prong, "similarly situated" employees are employees who are treated more favorably in "nearly identical" circumstances; the Fifth Circuit defines "similarly situated" narrowly. *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007). Similarly situated individuals must be "nearly identical" and must fall outside the plaintiff's protective class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005). Where different decision makers or supervisors are involved, their decisions are rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004), *citing Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) for the proposition that "[a] demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision making"). *See also Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004)("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"); *Hockman v. Westward Communications, LLC*, 282 F. Supp. 2d 512, 527-28 (E.D. Tex. 2003)("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage, is a stringent standard--employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'"), *citing Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 514

(5th Cir. 2001)(Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors; "to establish disparate treatment a plaintiff must show that the employer 'gave preferential treatment to [] [another] employee under 'nearly identical' circumstances' . . .; that is "the misconduct for which [plaintiff] was discharged was nearly identical to that engaged in by . . . [other] employee[s].'")).

If the plaintiff makes a *prima facie* case, there is a presumption of discrimination, and the burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Chevron Phillips*, 570 F.3d at 615.

If the employer meets this burden, the presumption of discrimination disappears and the plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the defendant intentionally discriminated against the plaintiff because of her protected status. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). To do so, the plaintiff must produce substantial evidence showing that the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *Reeves*, 530 U.S. at 143. "Evidence is 'substantial' if it is 'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2004). Plaintiff may use either of two methods to rebut each of the nondiscriminatory reasons articulated by the employer: pretext or mixed motive. *Rachid v. Jack in The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

For pretext, the plaintiff must show that the defendant's proffered explanation is false or "unworthy of credence." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2004), *citing Wallace*, 271 F.3d at 221. One way is to show that the employer treated plaintiff more harshly than other "similar situated employees" for "nearly identical conduct," i.e, a disparate treatment theory

using comparators.  *Wallace*, 271 F.3d at 221; *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).  Although the presumption of discrimination has disappeared, the trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom in determining whether the employer's explanation is pretextual.  *Reeves*, 530 U.S. at 143.  Coupled with the Plaintiff's *prima facie* case, for purposes of summary judgment the evidence of pretext usually will constitute sufficient evidence to raise an issue of material fact as to whether the employer's reason is credible or merely a pretext for discrimination or, if its reason is true, that a discriminatory reason more likely motivated the decision to effect its adverse employment action.  *Reeves*, 530 U.S. at 143, 147-49.[2]  Sometimes, however, additional evidence may be required.  *Id.*  "[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.'  In other words, '[i]t is not enough . . . to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* at 146-47 (emphasis in original), *citing St. Mary's Honor Center*, 509 U.S. at 511, 524, 519.  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  *Id.* at 148-49.

---

[2] In *Reeves*, the Supreme Court found that the Fifth Circuit panel "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination."  *Reeves*, 530 U.S. at 149.

Alternatively, rather than demonstrating that the defendant's articulated reason for its action is a pretext for discrimination, the plaintiff may show that the defendant's reason for the decision, while true, is only one reason for its conduct and another motivating factor is plaintiff's protected characteristic.[3]  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Pinkerton v. U.S. Dept. of Educ.*, 508 F.3d 207, 213 (5th Cir. 2007).

## B.  Hostile Work Environment

"'The creation of a hostile work environment through harassment . . . is a form of proscribed discrimination.'"  *EEOC v. Boh Brothers Construction Co., LLC*, __ F.3d __, No. 11-30770, 2013 WL 5420320, at *4 (5th Cir. Sept. 27, 2012)(*en banc*), *quoting Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 2455 (2013)(Thomas, J., concurring).

To prevail on a hostile work environment claim plaintiff must prove that her "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986).  An objective "reasonable person" standard applies to evaluate severity or pervasiveness of the discriminatory intimidation.  *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013)(*en banc*).  The court should focus on "(1) the frequency of the discriminatory conduct; (2) the severity; (3) whether it is physically threatening or humiliation as opposed to mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether the workplace undermines the plaintiff's workplace competence."  *Jackson v. Honeywell Intern., Inc.*, __ Fed. Appx. __, No. 13-20575, 2015 WL 585882, at *6 (5th Cir. Feb. 12, 2015), *citing Hockman v. Westward Communications,*

---

[3] The Fifth Circuit calls this the "modified *McDonnell Douglas*" approach.  *Rachid*, 376 F.3d at 312.

*LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004).  *See also Spencer v. Schmidt Elec. Co.*, 576 Fed. Appx. 442, 446 (5th Cir. 2014)(To prevail on a hostile work environment claim a plaintiff must prove "(1) membership in a protected group; (2) harassment based on a factor rendered impermissible by Title VII; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment yet failed to address it promptly," i.e., failed to take prompt remedial action), *citing Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012).  To affect a term, condition or privilege of employment, the harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment" in the eyes of a reasonable person.  *Boh Bros.*, 731 F.3d at 453, *quoting Aryain v. Wal-Mart Stores of Texas, LP*, 534 F.3d 473, 479 (5th Cir. 2008).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"; "Title VII . . . is not a 'general civility code.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  In the final analysis, whether an environment is hostile or abusive depends on the totality of the circumstances.  *Harris*, 510 U.S. at 23; *Boh Bros.*, 731 F.3d at 453. "Under the totality of circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim."  *EEOC v. WC & M Enters.*, 496 F.3d 393, 400 (5th Cir. 2007).  *See also Lauderdale v. Tex. Dept. of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007)("An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment.").

If the harasser is the victim's coworker, "the employer is liable only if it was negligent in controlling working conditions."  *EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 452 (5th Cir. 2013).  Where the harassment is by a supervisor and not a coworker, the employer is strictly

liable if the harassment results in a tangible employment action; if there is no tangible employment action, the employer may escape liability by proving an affirmative defense that (1) it exercised reasonable care to prevent and correct any harassing behavior and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that employer provided. *Spencer*, 576 Fed. Appx. at 446. The United States Supreme Court recently clarified the proper definition of a supervisor in a Title VII claim for workplace harassment in *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013): "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."[4] A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2442.

A racially hostile work environment claim may be brought under Title VII, § 1981, and/or the Texas Labor Code. *Jackson v. Honeywell , Inc.*, __ Fed. Appx. __, No. 13-20575, 2015 WL 585882 (5th Cir. Feb. 12, 2015).

C.  Retaliation

To assert a claim of retaliation under Title VII, a plaintiff with only circumstantial evidence must satisfy the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First the plaintiff must make a *prima facie* case of retaliation that meets three elements: (1) the employee engaged in an activity that is protected by Title VII;

---

[4] In *Vance*, the Supreme Court rejected "the nebulous definition of a 'supervisor' advocated in the EEOC guidance and substantially adopted by several courts of appeals": "a person either "authorized 'to undertake or recommend tangible employment decisions affecting the employee,' . . .*or* . . . an individual authorized to 'direct the employee's daily work activities.'" *Id.* at 2443, 2455.

(2) the employer took an adverse employment action against the employee; and (3) there is a causal connection between the protected activity and the adverse employment action. *Brazoria County, Tex. v. EEOC*, 391 F.3d 685, 692 (5th Cir. 2004), *cited for that proposition in Cooper v. Dallas Police Assoc.*, 278 Fed. Appx. 318, 320 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 1912 (2009). *See also McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

The statute defines "protected activity" as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e-3(a)(the "opposition clause"). Section 2000e-3(a)(the "participation clause") prohibits retaliation for the making of a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under the statute. *Glorioso v. Mississippi Dept. of Corrections*, 193 F.3d 517, No. 99-60147, 1999 WL 706173, at *3 (5th Cir. Aug. 20, 1999), *citing Grimes v. Texas Department of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996). The complainant employee using the opposition clause must "'show that she had a reasonable belief that the employer was engaged in unlawful employment practices.'" *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007), *quoting Byers v. Dallas Morning News*, 209 F.3d 419, 428 (5th Cir. 2000).

"[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003). The anti-retaliation provision of Title VII does not protect an employee from all retaliation, but only from retaliation that produces an injury or harm. *Burlington Northern*, 548 U.S. at 67.

An "adverse employment action," for the second prong, in a retaliation claim only, is not

limited to the Fifth Circuit's previous "ultimate employment decision" standard for discrimination claims under the statute. The Supreme Court has held that "the standard for retaliation is broader than for discrimination" in that such actions are not limited to tangible employment actions. For purposes of a retaliation claim, an adverse employment action is one that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006).[5] *See also McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)(same)(*quoting Burlington N.*, 548 U.S. at 68). "The purpose of this objective standard is 'to separate significant from trivial harms' and 'filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Stewart v. Mississippi Transp. Cm'n*, 586 F.3d 321, 331 (5th Cir. 2009)*, citing Burlington N.*, 548 U.S. at 68.

Unlike the mixed motive causation analysis permissible for other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. v. Texas Southwest Med. Center v.*

---

[5] As the Fifth Circuit explained in *Bouvier*, 2009 WL 3444765, at *3 n.2,

> The Supreme Court has held that Title VII's anti-retaliation provisions prohibit more conduct than its anti-discrimination provisions. *See Burlington Northern*[, 548 U.S. 53]. Expressly limiting its holding to retaliation claims, the Supreme Court abrogated the "ultimate employment [decision] test" and held that employees must show that a reasonable employee would have found the challenged action materially adverse. *Id.* at 67. However, in the Fifth Circuit the "ultimate employment test" still applies to cases alleging discrimination. *See McCoy* [*v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007)] ("In *Burlington Northern*, the Court expressly limited its holding to Title VII *retaliation* claims . . . ."(emphasis in the original).

*Nassar*, __ U.S. __, 133 S. Ct. 2517, 2533 (2013).  *In accord, Finnie v. Lee County, Miss.*, 541 Fed. Appx. 368, 371-72 (5th Cir. Sept. 12, 2013).

Noting that "the existence of a causal link between a protected activity and an adverse employment action is a 'highly fact specific' and difficult question," the Fifth Circuit has identified factors supporting causation including "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination."  *Smith v. Xerox Corp.*, 371 Fed. Appx. 514, 520 (5th Cir. Mar. 24, 2010).  Where only temporal proximity exists, to be adequate evidence of causality for a *prima facie* case, it must be very close.  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001);  *Strong v. University Healthcare System, LLC*, 482 F.3d 802, 808 (5th Cir. 2007).

If the plaintiff succeeds in making a *prima facie* case of retaliation, a presumption of discrimination arises, and the burden shifts to the defendant employer, to provide a legitimate, nonretaliatory reason for the adverse employment action.  *Hockman v. Westward Communications LLC*, 407 F.3d 317, 330 (5th Cir. 2004), *cited for that proposition in Cooper*, 278 Fed. Appx. at 320.  If the employer succeeds, under the *McDonnell Douglas* framework the presumption of discrimination falls away and the plaintiff must show that the employer's articulated reason for its action is merely a pretext for retaliation.  *Cooper*, 278 Fed. Appx. at 320, *citing McDonnell Douglas*, 411 U.S. at 804.   The plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.  *McCoy*, 492 F.3d at 557.   The plaintiff can show pretext "by showing that the employer's proffered  explanation is false or 'unworthy of credence.'"  *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003), *quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 143.  For example, a plaintiff could

show that she is clearly better qualified than the person who got the job, promotion, raise, etc.,[6] or demonstrate that the employer's articulated reason is false by showing inconsistency in the employer's explanations at different times. *Burrell*, 482 F.3d at 412, *citing Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001), and *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002)("a factfinder may infer the ultimate fact of retaliation by the falsity of the explanation"). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and thereby preclude summary judgment. *Reeves*, 530 U.S. at 135.

II.  Title 42 U.S.C. § 1981

Section 1981 protects against race-based discrimination. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). *See also Foley v. Univ. of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003)(§ 1981 protects against retaliation for opposition to race discrimination in the workplace).  Title 42 § 1981 prohibits race discrimination in private employment against both blacks and whites. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976)("[O]ur examination of the language and history of § 1981 convinces us that § 1981 is applicable to racial discrimination in private employment against white persons."); *Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981)("Section 1981 generally forbids racial discrimination in the making and enforcement of private contracts, including private employment contracts, whether the aggrieved party is black or white" and it "also reaches claims of racial discrimination in admissions to

_____

[6] "However, the bar is set high for this kind of evidence because differences in qualification are generally not probative evidence of discrimination unless those disparities are 'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Celestine*, 266 F.3d at 357, *quoting Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999).

private institutions, at least where such institutions purport to be open to the public."), *cert. denied*, 456 U.S. 933 (1982).  "[S]ex discrimination is not cognizable under § 1981," however. *Bobo*, 662 F.2d at 344-45; *Daigle v. Gulf State Utilities Co., Local Union No. 2286*, 794 F.2d 974, 980 (5th Cir. 1986).

Employment discrimination claims under 42 U.S.C. § 1981, which protects against race-based discrimination,[7] "are analyzed under the evidentiary framework applicable to claims arising under Title VII of the Civil Right Act of 1954." *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999)(per curiam).

The elements for a *prima facie* case of retaliation under § 1981 are the same as those under Title VII (plaintiff engaged in an activity protected by § 1981, he was subject to an adverse employment action, and a causal link exists between the protected activity and the adverse employment action).  *Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 316 (5th Cir. 2003).  It also follows the burden-shifting framework of *McDonnell Douglas*.  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2003).

III.  The TCHR

The Texas Commission on Human Rights Act ("TCHRA"), Section 21.051 of the Texas Labor Code, provides in relevant part, "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin or age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . ."  In enacting the TCHRA, the Texas Legislature intended to correlate "state law with federal law in

---

[7]  *Runyon v. McCrary*, 427 U.S. 160, 167 (1976)(§ 1981 protects against race-based discrimination); *Foley v. Univ. of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003)(§ 1981 protects against retaliation for opposition to race discrimination in the workplace).

the area of discrimination in employment." *Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.--Houston [14th Dist.] 1998, no writ).   Thus the same burden-shifting framework used to analyze a case under the federal discrimination statutes applies under the Texas statute. *Id*.   The case law developed under Title VII governs claims under the TCHRA. *Texas Dep't of Human Services v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995).   TCHRA's express purpose is "the execution of the policies embodied in Title VII." *Schroeder v. Texas Iron Works, Inc*., 813 S.W.2d 483, 485 (Tex. 1991); Texas Labor Code Ann. § 21.001(1).   Therefore courts interpret the TCHRA to be consistent with federal law. *Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 n.5 (5th Cir. 1995); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996).

IV.  Common Law Invasion of Privacy

Two types of common law invasion of privacy recognized by Texas law are  1) intrusion upon a person's right to be left alone in her affairs and (2) freedom from public disclosure of embarrassing private facts about an individual.  *Cain v. Heart Corp.*, 878 S.W. 2d 577, 578-80 (Tex. 1994)[8](refusing to recognize false light invasion of privacy tort because "1) it largely duplicates other rights of recovery, particularly defamation; and 2) it lacks many of the procedural limitations that accompany actions for defamation, thus unacceptably increasing the tension that already exists between free speech constitutional guarantees and tort law.").

To prevail on a claim for intrusion on seclusion, a plaintiff must show a highly offensive, intentional intrusion, physical or otherwise, upon her solitude, seclusion, or private affairs or concerns.  *Valenzuela v. Aquino*, 853 S.W. 2d 512, 513 (Tex. 1993).  *See also Aldridge v. Sec.,*

---

[8]  *Cain,* 878 S.W. 2d at 578 n.2, acknowledges that another type of privacy right, protecting against appropriation of name or likeness, was addressed in a single Texas case, *Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719, 721-22 (Tex. Civ. App.--Eastland 1975, writ ref'd n.r.e.).

*Dep't of the Air Force*, No. Civ. 7:05CV00056-R, 2005 WL 2738327, at *3 (N.D. Tex. Oct. 24, 2005)(the three elements of intrusion on seclusion are "(1) an intentional intrusion on the Plaintiff's solitude, seclusion, or private affairs (2) that would be highly offensive to a reasonable person and (3) resulted in an injury to the Plaintiff."), *citing Valenzuela* for elements (1)-(2), and *K-Mart Corp. v. Trotti*, 677 S.W. 2d 632, 638 (Tex. App.--Houston [1[st] Dist.] 1984, writ ref'd n.r.e.) for element (3)).   There cannot be an "intrusion" where there is no legitimate expectation of privacy.  *Smith v. Methodist Hospitals of Dallas*, No. 3:07-CV-1230-P, 2008 WL 5336342, at *6 (N.D. Tex. Dec. 19, 2008), *citing Vaughn v. Drenno*, 202 S.W. 3d 308, 320 (Tex. App.--Tyler 2006, no pet.).   Usually an action for intrusion upon one's seclusion is found "only when there has been 'a physical invasion of a person's property or . . . eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying.'"   *Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 273 (5th Cir. 1989)(*quoting Gill v. Snow*, 644 S.W. 2d 222, 224 (Tex. App.--Fort Worth 1982, no writ), *abrogated on other grounds, Cain v. Hearst Corp.*, 878 S.W. 2d 577), *quoted for this proposition by Moyer v. Jos. A. Bank Clothiers, Inc.*, No. 3:11-CV-3076-L, 2013 WL 4434901, at *7 (N.D. Tex. Aug. 19, 2013).   "To be actionable, the intrusion must be highly offensive meaning that it must be unreasonable, unjustified or unwarranted."  *Cherkaoui v. Santander Consumer USA, Inc.*, 32 F. Supp. 3d 811, 816 (S.D. Tex. 2014).

For a claim of public disclosure of private facts the plaintiff must prove there was publicity about matters concerning her private life.  *Polansky v. Southwest Airlines Co.*, 75 S.W. 3d 99, 104-05 (Tex. App.--San Antonio 2002, no pet.).   To prevail on public disclosure of private facts, a plaintiff must show (1) matters regarding her private live were published, (2) such publication would be highly offensive to a reasonable person of ordinary sensibilities, and (3) the

matter publicized is not a matter of legitimate public concern. *Garcia v. City of Laredo, Texas*, No. 5:10-CV-30, 2011 WL 9559236, at *7 (S.D. Tex. Sept. 1, 2011), *aff'd*, 702 F.3d 788 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 2859 (2013), *citing Indus. Found. of the South v. Texas Indus. Accident Bd.*, 540 S.W. 2d 668, 682 (Tex. 1976), *cert. denied*, 430 U.S. 931 (1977). *In accord, Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 273 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989). "Publicity" for this tort "requires communications to more than a small group of persons; the matter must be communicated to the public at large, such that the matter becomes one of public knowledge." *Indus. Found.*, 540 S.W. 2d at 683-84.

"Invasion of privacy claims are subject to qualified privilege." *Minckler v. Exxon Corp.*, No. 05-95-01015-CV, 1997 Tex. App. LEXIS 343, at *14 (Tex. App.--Dallas [5th Dist.] Jan. 30, 1997)("The same qualified privilege that applies to invasion of privacy clams also applies to defamation cases."). "A qualified privilege exits when an employer makes a statement in good faith, on a subject in which the person communicating has an interest or duty, to a person having a corresponding interest or duty." *Id.*

In *Hardwick v. Houston Lighting and Power Co.*, 881 S.W. 2d 195, 198 (Tex. App.--Corpus Christi [13[th] Dist.] 1994, writ dism'd w.o.j.)("Statements made to the employment commission are absolutely privileged as are statements made at a judicial or quasi-judicial hearing."), the court held that the defendant employer's representative's statements at the hearing before the Texas employment commission were absolutely privileged, as were statements made at judicial or quasi-judicial hearing, and do not constitute publication in an action in slander. "A qualified privilege embraces communications made in good faith on matters in which an author has an interest or to which he has a duty to perform to another person having a corresponding interest or duty." *Id.* at 198-99. *See also Chamblee v. Miss. Farm Bureau Federation*, 551 Fed.

Appx. 757 (5th Cir. Jan. 6, 2014)(finding that the defendant's statements to the EEOC could not

form the basis for an invasion of privacy or defamation claim because they were subject to

qualified privilege as statements in which the defendant had an interest and were made in good

faith to a person having a corresponding interest or duty), *citing Stockstill v. Shell Oil Co.*, 3 F.3d

868, 872 (5th Cir. 1993)("explaining that an employer has a duty to cooperate in EEOC

investigations and an interest in defending itself against an employee's charge").

Any statements or accusations made by an employer concerning any of its employees that

are made to a third person who has a common interest in the matter are protected by privilege.

*See Duffy v. Leading Edge Prods, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995), *citing Marathon Oil Co.*

*v. Salazar*, 682 S.W. 2d 624, 630 (Tex. App.--Houston [14[th] Dist.] 1984, writ ref'd n.r.e.)("A

communication on the subject in which the author of or the public has an interest, or with respect

to which the author has a duty to perform to another owing a corresponding duty, may constitute

a qualified or conditional privilege.").  *See also ContiCommodity Servs. v. Ragan*, 63 F.3d 438,

442 (5th Cir. 1995)("Accusations or comments about an employee by his employer, having an

interest or duty in the matter to which the communication relates, have a qualified privilege."),

*cert. denied*, 1996 WL 26533 (U.S. Mar. 25, 1996); *Reed v. Chevron Pipe Line Co.*, 84 F.3d 432,

No. 95-50409, 1996 WL 248864, at *3 (5th Cir. Apr. 8, 1996)(citing all above cases), *cert.*

*denied*, 519 U.S. 929 (1996).  Whether a communication is qualifiedly privileged is a question of

law for the court.  *Reed*,, 1996 WL 248864, at *3, *citing Schauer v. Memorial Care Systems*, 856

S.W. 2d 437, 449 (Tex. App.--Houston [1[st] Dist.] 1993).  The qualified privilege must be pleaded

as an affirmative defense.  *Id., citing ContiCommodity*, 63 F.3d at 443.  If the employer pleads

that affirmative defense, the burden, a heavy one, shifts to the plaintiff to prove actual malice.

*Id., citing Duffy*, 44 F.3d at 313.  The qualified privilege is lost if the communication was made

with actual malice. *Id.* at * 3 and 6*; Schauer*, 856 S.W. 2d at 449, *citing inter alia Marathon Oil*, 682 S.W. 2d at 631.

"Actual malice" is a term of art. *Reed, id.* The Fifth Circuit applies the following definition of "actual malice, a term of art ultimately borrowed from *New York Times v. Sullivan*, 376 U.S. 254 (1964) and its progeny defamation cases:

> Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. "Reckless disregard" is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." An error in judgment is not enough.

*Duffy*, 44 F.3d at 313; *Reed*, 1996 WL 248864, at *3. Thus "actual malice" is a "higher standard than common law malice" and "only clear and convincing proof will support recovery." *Reed*, 1996 WL 248864, at *3, *citing Duffy*, 44 F.3d at 313. It is "a subjective standard that centers on the state of the mind of the person(s) making the allegedly defamatory statements or who terminated the employee, whether he questioned the truth of his communication, not on the objective truth of the declarations themselves. *Reed*, 1996 WL 248864, at *4. The person making the purported defamatory statement is entitled to a presumption of good faith and lack of malice. *Id., citing Schauer*, 856 S.W. 2d at 449.

V. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, and (3) the defendant's conduct caused the plaintiff severe emotional distress. *Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W. 3d 438, 445 (Tex. 2004); *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W. 2d 62, 65 (Tex. 1998). Whether a defendant's conduct was "extreme and outrageous" is a question of law for the court. *Tiller v. McClure*, 121 S.W. 3d 709, 713 (Tex. 2003)(per curiam);

24 / 46

*Bradford v. Vento*, 48 S.W. 3d 749, 758 (Tex. 2001). "Extreme and outrageous conduct" for purposes of this tort is "conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Hoffmann-La Roche*, 144 S.W. 3d at 445, *quoting Twyman v. Twyman*, 855 S.W. 2d 619, 621 (Tex. 1993)(quoting *Restatement (Second) of Torts § 46*, cmt. d (1965). The defendant is not liable for "mere insults, indignities, threats, annoyances, and petty oppressions, or other trivialities." *Id., citing GTE Southwest, Inc. v. Bruce*, 998 S.W. 2d 605, 612 (Tex. 1999). "[M]ost human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W. 3d 788, 796 (Tex. 2006). To prevail on a claim for intentional infliction of emotional distress in the workplace, an employee must show the existence of some conduct outside the scope of an ordinary employment dispute and into the arena of extreme and outrageous conduct. *GTE Southwest, Inc. v. Bruce*, 998 S.W. 2d 605, 612 (Tex. 1999). *See also Diamond Shamrock Refining & Marketing Co. v. Mendez*, 844 S.W. 2d 198, 202 (Tex. 1992)(falsely representing in the community that an employee is a thief is not sufficiently outrageous conduct to support a claim for intentional infliction of emotional distress), *overruled on other grounds*, *Cain v. Hearst Corp.*, 878 S.W. 2d 577, 578-79 (Tex. 1994). Furthermore the emotional distress must be so "severe" that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *GTE Southwest*, 998 S.W. 2d at 612. The party asserting such a claim must show the nature, duration, and severity of his anguish with evidence of an extreme degree of mental pain and distress, more than mere worry, disappointment, anxiety, vexation, embarrassment, anger, which are not sufficient to establish severe emotional distress, although it may include these. *GTE Southwest*, 998 S.W. 2d at 618; *Parkway Co. v. Woodruff*, 201 S.W. 2d

434, 444 (Tex. 1995)(plaintiff generally must show a substantial disruption in his daily routine).

Intentional infliction of emotional distress is a "gap-filler" tort to allow recovery on the rare occasions when a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized cause of action for relief. *See generally Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W. 3d 438, 447 (Tex. 2004). The tort of intentional infliction of emotional distress is available only when "severe emotional distress is the intended consequence or primary risk of the actor's conduct"; there is no liability if the actor "intends to cause some other harm or if his conduct poses a risk of some harm other than emotional distress" even if emotional distress results. *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W. 2d 62, 67 (Tex. 1995).

### Chase's Motion for Summary Judgment

Because the Original Petitions of Plaintiff La Toya Graham-Lacy's[9] ("Plaintiff" or "Graham"), an African American female, are bare-bones pleadings, the Court does not summarize them, but instead addresses the motion for summary judgment and related pleadings, which fill in the facts with supporting evidence.

When Plaintiff was hired as a Business Banking Wholesaler at Chase by Kurosky, Plaintiff's offer letter indicated that her "employment is subject to the firm's policies and procedures, including [Chase's] Code of Conduct as in effect from time to time during [her] employment." #24, Ex. A (Offer Letter); Ex. B (Graham's Deposition) at p. 68:15-17; Ex. J (Kurosky Declaration) at ¶ 2; Ex. C (Kurosky Deposition) at pp. 49:14-24, 55: 1-3. Graham signed the letter, demonstrating her acceptance of the employee-at-will position and affirming

---

[9] In her Original Petitions (#1-3 in both suits), although the style identifies her as La Toya Graham, Plaintiff frequently refers to herself as "Ms. Lacy." During her deposition she explained that Lacy is her married name, Graham her maiden name, and she goes under either or hyphenates it. #24-3, Ex. B at pp. 16: 9-17:4.

that she had read and understood the Code of Conduct and agreed "as a condition of her employment to comply with the Code as amended and revised from time to time." Ex. A.  In particular she acknowledged that "the Code requires that certain outside activities be approved in writing after [she] begin[s] employment, and [she] agree[d] that if any such required approval is denied, [she] will cease the relevant activity immediately." *Id.*  Graham began work on October 1, 2011, and her direct supervisor was Kurosky.  Ex. A; Ex. B at pp. 71:16-18 and 79:16-17.

On January 6, 2012, Chase's Anti-Money Laundering Operations ("AML Ops") commenced an investigation into Chase Business Banking customer Monica Colbert d/b/a America's Society for Kids's ("ASK's") business account because a substantial number of wire transfers of more that $10,000 each were being sent to and out of the account.  Ex. K, Chase's Human Resources Partner Wendy Roberts' ("Roberts'") Decl., Ex. 1, Global Security & Investigations department ("GS&I") Report at [JPMORGAN 0001].  The review uncovered that there were many transactions in which Graham's Chase banking account received wire transactions from the ASK business account between September 8, 2011 and February 24, 2012. Because a Chase employee was involved, AML Ops stopped its investigation and notified Chase's GS&I, an internal department in Chase that monitors and investigates potential Code of Conduct violations by Chase employees, of the situation.  *Id.*; Ex. E (GS&I regional manager Benjamin Turner's ("Turner's") Deposition) at p. 12:1-15.   GS&I undertook a formal investigation into this activity to and from Graham's account.  Ex. K, Roberts Decl., Ex. 1, GS&I Report at [JPMORGAN 0001].[10]

The investigation revealed that from September 2, 2010 through April 15, 2012 she received online transfers from different Chase bank customer accounts, including ASK, and

---

[10] During her deposition, Graham stated that she had worked in AML.  #24-2, at p. 180:1-24, so she should have been aware of the potential significance of these transfers.

unidentified cash deposits amounting to $1,218,629.51. *Id.* The inquiry further revealed that after receiving an online transfer, at times she would make a large payment to her American Express credit card for some of the amount transferred to her, although there remained a surplus in her bank account from the transfers. *Id.* Ex. K, Roberts' Decl., Ex. 2, Spreadsheet of Transfers. GS&I contacted American Express, which confirmed that the credit card belonged to Graham, revealed that large purchases from $5,000-$20,000 were made on the card between various ad agencies (radio, TV, print) and hotels, and numerous purchases were made at Colbert Ball Tax Service in Houston, Texas. Ex. K, Roberts' Decl., Ex. 1, GS&I Report at [JPMORGAN 0002].

On May 22, 2012 Turner interviewed Graham and obtained her signed statement in which she responded to the investigation's findings. Ex. K, Roberts' Decl., Ex. 1, GS&I Report at [JPMORGAN 0003]; Ex. C, Kurosky Dep. at p. 86:21-24. In that statement Graham admitted that she and her husband owned two Colbert-Ball Tax Franchises. Ex. F, Graham's Statement. She also stated that Al Colbert, a friend, transferred money to her account relating to his business dealings with her husband, and she would regularly pay the expenses regarding their business. *Id.*

Subsequently pursuant to a decision made by Kurosky and Human Resources with the approval of Kurosky's manager, Kurosky placed Plaintiff on temporary, paid leave, pending the result of the investigation in compliance with Chase's protocol to determine if Graham had violated the Code of Conduct. Ex. C, Kurosky Dep. at pp. 106:23-107:1. *Id.* at p. 107:2-12.

Roberts then reviewed the findings of the GS&I investigation and consulted with the People Support team. Roberts concluded that Graham had violated the Code of Conduct by engaging in outside business activities (the Colbert-Ball Tax Franchises for which she had not

received preapproval) and in conducting multiple, large transactions with a Chase customer.  Ex.

G, Roberts' Dep., pp. 49:11-50:24; Ex. F, Graham's Statement.  Graham admitted that she had

received large transfers from a Chase Business Banking customer's account.[11]   *Id.*   Roberts

informed Kurosky that Graham would be terminated for the violations.  Ex. C, Kurosky Dep. at

p. 116:7-16.  Roberts sent a completed "Recommendation for Termination" form to Kurosky for

her signature, which Kurosky signed, recommending Graham's termination to Roberts, Lesley

Maier (People Support team), and Alice Rodriguez, Kurosky's supervisor.  Ex. J, Kurosky's

Decl. at ¶ 4; Ex. C, Kurosky's Dep. at   pp. 132:4-15, 133:21-134:3, 134:10-18, 137:5-11,

137:25-138:2; Ex. K, Roberts' Decl. at ¶ 5 and Ex. 3, Recommendation for Termination of L.

Graham.  Kurosky formally told Graham on May 31, 2012 that her employment was terminated,

Ex. B, Graham's Dep. at pp. 130:25-131:19; Ex. G, Roberts' Dep. 93:16-19; Ex. C, Kurosky's

Dep. at 122:4-8.

Chase maintains that Graham's race discrimination and hostile work environment claims

fail as a matter of law.  Graham's deposition testimony shows that her race discrimination claim

is based (1) on alleged comments and treatment of her by Kurosky regarding the appearance that

Graham is financially well off because she possessed expensive bags,[12] luggage, and two

Mercedes cars, (2) on Kurosky's failure to appreciate Graham's job performance, (3) on two

---

[11] Graham contends that the reasons for her discharge were fabricated, that she never admitted to violating company policy, but testified that there was never a doubt in her mind that she was following proper policy, and that she fit into the exception in section 3.3.3 of the Code of Conduct that a Chase employee can act as a fiduciary for a family member or close friend, in her case, Al Colbert.

[12] When asked what about the comments made Graham feel they were racially motivated, Graham replied, "[b]ecause it had been going on prior quite a bit" and "[s]he never asked anybody else that.  It was always me. . . . Because my other white counterparts were never harassed in this way.  They were never talked to about what they carry, what they drive, on a consistent basis."  #24-1, Ex. B at p. 103:1-24.

occasions when Kurosky cut Graham off in meetings when she was speaking and allowed a white person to take Graham's time, leaving her embarrassed in front of her peers, (4) when she performed everything as Kurosky told her to do, Kurosky would tell her she had to do more or that the focus had changed and she needed to do something in a more difficult way when everyone else was treated differently, and (5) on one occasion when she was misled, not advised in advance of, and humiliated by being brought by Kurosky to an interview by an investigator in a building on another side of town where people she knew had offices for the investigation that ultimately led to her termination. Ex. B, Graham Dep. at pp. 92:17-99:25, 100:19-101:9, 105:13-16.   Graham also alleges that in retaliation, after her discharge when she applied for unpaid wages (her bonus), Kurosky deprived her of her quarterly bonus for the first quarter of 2012 by failing to submit the paperwork.  Ex. B at p. 159:3-25.  Chase contends that none of Kurosky's statements constitutes actionable harassment nor competent evidence of race discrimination. Even if Kurosky did all that Graham alleges she did, Chase insists that because Kurosky's conduct and comments are not based on race, they are insufficient to support a hostile work environment claim as a matter of law.  There is nothing inherently racial about commenting on a subordinate employee's bag, luggage, or personal possessions or their cost.  Nor is a supervisor's failure to recognize an employee's performance, or interrupting an employee's speech, an inherently race-based act.  Plaintiff conceded that Kurosky never mentioned Graham's race when she allegedly made those comments about her purse or her cars.  Ex. B at p. 103:17-19.  Instead, given Graham's lack of objective evidence of race discrimination, Chase argues that her feeling that Kurosky's comments and conduct were racially based was purely subjective.[13]   Chase

---

[13] As an example, the Court points to her deposition testimony, #24-3, Ex. B at pp. 106:9-107:7

        Q. The comments about your bags.  Okay, I want to know  why you think  that

contends that Graham cannot prove that she was racially discriminated against or the any harassment was severe or pervasive, or that her work environment was "permeated with discriminatory intimidation, ridicule, and insult sufficient to alter the conditions of her employment and create" a hostile work environment that a reasonable person would find sufficiently abusive to destroy her opportunity to succeed in the workplace. *Harris*, 510 U.S. at 21.   Moreover she has no evidence that a similarly-situated employee (meeting all the requirements for that status:  see pp. 11-12 of this Opinion and Order) outside her protected class was treated more favorably than she was; specifically she cannot demonstrate that a non-African American (male or female) employee engaged in outside business activities and/or involved in personal transactions with a Chase customer, was not terminated by Chase for Code of Conduct violations.   Chase points out that Kurosky previously terminated a white, male employee for a

---

was motivated by race when she asked you those questions.

A.  I look at the whole situation, and the totality of it all, and it's not just the bags, it's the way she treated me different from any of my coworkers, any of my white coworkers.  She did not treat me the same way.  She treated me different to make me--to be honest with you, my true feeling, she made me feel like, okay, you know, why does this little black girl, you know, drives this car, carrying these bags.  Who is her husband?  Who is she? That's what she made me feel like.

Q.  That was how you--you interpreted what she was saying?

A.  Exactly.

Q.  Yeah.  Okay.

A.  I interpreted by her actions because she didn't treat any of my other white counterparts that way.

Q.  Okay.

A.  You know, to cut me off.  It's like so that I could have no voice, to humiliate me.  Those are the things that I felt.  And I can't take it any other way, because when I put it all together, it is what it is, and that's how I felt.

less severe Code of Conduct violation.  Ex. J, Kurosky's Decl. at ¶ 6; Ex. K, Roberts Decl. at ¶ 7 and Ex. 5, 2008 Recommendation for Termination.

Furthermore the uncontroverted evidence demonstrates that Kurosky did not initiate or conduct the investigation that led to Plaintiff's discharge, but rather that Kurosky simply adopted the recommendation of the Human Resources department, specifically of Wendy Roberts, to terminate Graham's employment.  Ex. G, Roberts Dep. at pp. 49:11-50:24; Ex. C, Kurosky Dep. at pp. 132:4-15, 133:21-134:3. 134:10-18, 137:5-11, and 137:25-138:2.    Chase argues that Graham has no other evidence of alleged racial discrimination or harassment.  Graham cannot satisfy her burden to show discrimination by asserting conclusory opinions or subjective beliefs. *Little v. Republic Refining Co., Ltd.*, 924 F.3d 93, 96 (5th Cir. 1991).

Concerning her retaliation claim, Chase emphasizes that the Court lacks jurisdiction over the retaliation claim under both Title VII and the TCHRA because Graham failed to exhaust her administrative remedies regarding it.  *Barnes*, 118 F.3d at 408 ("The filing of an administrative complaint is a jurisdictional prerequisite to a Title VII action.  Further, a complainant must pursue and exhaust his administrative remedies prior to filing a judicial complaint.").   It is undisputed that Graham did not allege retaliation in her EEOC charge.  Ex. B, Graham Dep. at pp. 210:10-211:14; Ex. H. Charge of Discrimination.   Thus she is barred from bringing a retaliation claim now.

Furthermore Graham cannot establish a *prima facie* case of retaliation because she cannot identify any "protected activity" performed by her, and she has acknowledged that she never complained to anyone about the alleged disparate treatment.[14]

---

[14]Actually she did testify that she complained to one of her coworkers, a black male named James, whose last name she could not remember, but conceded that he was not a supervisor and that  she did not complain about Kurosky's  behavior to anyone else at Chase.  #24-3, Ex. B at

Even if Graham could establish a *prima facie* case of race discrimination or retaliation and the burden of proof shifted to Chase, Chase contends that it had a legitimate, nondiscriminatory, nonretaliatory reason for terminating her employment (violations of the Chase Code of Conduct by engaging in outside business activities and conducting transactions with a Chase Business Banking customer account), and Graham has no evidence that it was pretextual.

Moreover, the evidence shows that Kurosky was responsible for hiring Graham at Chase. Courts have held that there can be no inference of race discrimination where the same actor hires and fires an employee. *O'Brien v. Lucas Assoc. Personnel, Inc.*, 127 Fed. Appx. 702, 707, No. 04-10738, 2005 WL 768773 (5th Cir. Apr. 5, 2005), *citing Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *White v. Omega Protein Corp.*, 226 Fed. Appx. 360, 362 (5th Cir. Mar. 16, 2007).

After her termination, Graham filed for lost wages (the unpaid bonus) owed to her by Chase (#25-3, Ex. 12) with the TWC,[15] in addition to her charge of race discrimination filed with

---

pp. 122: 23-123.  Graham stated that out of 12-14 small business bankers who were supervised by Kurosky, James was the only other African American employee besides herself.

[15] In her response (#25 at pp. 14-15 and Ex. 12) to the motion for summary judgment, and also relevant to her invasion of privacy claim, Graham reports that the TWC initially ruled against her and disqualified her from recovering the lost wages.  She appealed.  Chase hired a third party, Ernst and Young, represented by Ty Brown ("Brown"), who sent Graham a package of several of her private financial statements and records with her account numbers, balances, copy of a check and of a credit card and personal information.  She told Brown not to send this information to anyone, but he responded that he was going to send the documents to the TWC in accordance with Chase's instructions.  She complains and cites extensively to Brown's deposition that he failed to redact substantial parts of her private information even though he knew that he should have.  Although Brown sent the documents to the TWC, they were never received and have not been recovered.  Graham's Dep., #25, Ex. 2 at pp. 199:9-10, 191:1-25, 192:3-21); Brown's Dep, #25, Ex. 13, at p. 90:3-21.  The Appeal Tribunal of the TWC reversed the earlier ruling disqualifying Graham from receiving her  benefits. #15-13, Ex.12.

the EEOC.[16]   Chase insists that Graham's claim that Chase invaded her privacy[17] by giving her

and her husband's account statements to the TWC during the unemployment claims process, is

based on pure speculation and fails as a matter of law because (1) Chase made no "publication,"

(2) the communication to TWC is qualifiedly privileged, and Chase acted in good faith in

disclosing this information, and (3) Graham has no evidence of damages that resulted from the

alleged publication.   For the common law tort of public disclosure of private facts, the

communication must be to more than a small group of persons; "the matter must be

communicated to the public at large, such that the matter becomes one of public knowledge.

*Industrial Foundation*, 540 S.W. 2d at 683-84 (holding that "no privacy interest is invaded

---

[16] Because the EEOC was unable to finish its investigation of her charge within 180 days and terminated the processing of her charge, she requested and received her notice of right to sue letter. #25-16, Ex. 14.

    The Court would point out that even if the EEOC had reached a determination regarding her charge, EEOC findings of fact and determinations are not binding on the trier of fact, even though they are admissible as evidence in civil proceedings. *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985); *Massingill v. Nicholson*, 496 F.3d 382, 384-85 (5th Cir. 2007). *See also Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1971)(Title VII civil litigation "at the district level clearly takes on the character of a trial de novo, completely separate from the actions of the EEOC" and the EEOC's report "is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial."); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 201-02 (5th Cir. 1992)(the district court has the discretion to completely exclude an EEOC report if it finds that prejudice or other considerations enumerated in Federal Rule of Evidence 403 outweigh its probative value).  The same is true of TWC findings.  *In re Bradley*, 2007b WL 1500876, at *3 (W.D. Tex. May 18, 2007)("[A]n employment discrimination proceeding is by trial *de novo*, and a 'commission finding, recommendation, determination, or other action is not binding on a court.'"), citing Texas Labor Code Ann. § 21.262 (Vernon 2006).  Thus the TWC's determinations on both the first and appellate levels of her claim to unpaid wages do not affect this Court's determination.

[17] Graham claims that "over the course of five to six months, Chase's AML and GSI unit surreptitiously conducted an investigation behind Plaintiff's back, wherein they unlawfully accessed personal bank accounts, statements, credit records, as well as contacted third-party entities to access her private information, all without her permission or consent. . . . Defendant violated Plaintiff's privacy rights when it sent the above listed private information to a multinational third party, entity, Ernst and Young, who then forwarded her information to a government agency, the Texas Workforce Commission." #25 at p. 31.

merely by making private information available for public inspection."). Graham's account statements were sent only to the hearing officer at TWC. Plaintiff has no evidence that her information has become "public knowledge." Because there was no publicity, her claim fails as a matter of law. As for the claim that her husband's records were disclosed, it cannot stand because "Texas law does not permit a plaintiff to recover for injury caused by the invasion of another's privacy." *Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084, 1093 (5th Cir. 1984).

Chase additionally asserts that disclosure of the account statements to the TWC to support Chase's stance in the unemployment hearing was qualifiedly privileged and cannot constitute a claim here. Chase claims that it provided Graham's and her husband's account statements as part of its defense to her claim for wrongful discharge to demonstrate the reason it terminated Graham's employment. Ex. 1, Brown Dep., pp. 106:7-106:17, 109:8-14. Chase insists that Graham did not provide any evidence that the statements were not provided in good faith. Thus the communications cannot serve as the basis for an invasion of privacy claim, and Chase is entitled to summary judgment on Plaintiff's claim for "public disclosure of private facts" as a matter of law.

Regarding Graham's complaint that Chase invaded her privacy by contacting American Express about her credit card activity, Chase emphasizes that she merely speculates that Chase must have used a false identity or some other deception to gain the information about her credit card transactions; speculation is not competent summary judgment evidence. Ex. B, Graham Dep., at pp. 197:6-199:17, 202:4-23. She has no evidence that Chase made misrepresentations to American Express to obtain the information.

Graham's "intrusion on seclusion" invasion of privacy claim also fails because she does not allege, nor does she have any evidence of, a physical invasion of her property or of

eavesdropping on her conversations through wire taps, microphones, or spying.

Nor does Graham present any evidence of damages suffered by her that resulted from Chase's alleged invasion of her privacy or identify any specific injury because of Chase's alleged disclosure of her financial information to the TWC. Instead she testified that TWC did not even receive her bank statements. Ex. B, Graham Dep. at pp. 44:24-45:15.

Finally Chase contends that Graham's intentional infliction of emotional discrimination claim arises from and is based on the same facts as her discrimination claim, and she cannot raise a genuine issue of material fact about either. A plaintiff may not use the "gap-filler" tort of intentional infliction of emotional distress to circumvent the statutory limitations on mental anguish and punitive damages found in other laws. *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W. 3d 438 (Tex. 2004)(holding that employee could not bring an intentional infliction of emotional distress claim in order to circumvent the statutory cap on nonpecuniary damages for sexual harassment). Intentional infliction of emotional distress can only be asserted where a plaintiff has no other theory of recovery.

In sum Chase asserts that it is entitled to summary judgment on all of Plaintiff's claims as a matter of law.

### Graham's Response (#25)

Plaintiff begins with numerous extremely broad objections, seemingly characterizing all Chase's evidence as inadmissible. The objections are too general and vague to allow a ruling, with many on their face clearly lacking merit. The Court declares that it has determined that any evidence on which the Court relies in its ruling on the motion for summary judgment is in proper form and is admissible.

Moreover the Court does not repeat Plaintiff's allegations which it has summarized above

and reminds Plaintiff that conclusory assertions in her deposition testimony unsupported by admissible evidence, which abound in her response, are not competent summary judgment proof. *See Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996)("The law is well-settled, however, that 'unsubstantiated assertions are not competent summary judgment evidence.'"); *Grizzle v. Travelers Health Network,* Inc., 14 F.3d 261, 268 (5th Cir. 1994)(An employee's self-serving generalized testimony stating her subjective belief that discrimination occurred "is simply insufficient to support a jury verdict in plaintiff's favor."); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)("Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue. . . . if the nonmoving party rests upon merely conclusory allegations, improbable inferences, and unsupported speculation."). *See Clark v. Circle K Stores, Inc.*, Civ. A. No. 3:13-cv-00210-BAJ-RLB, 2014 WL 4129496, at *3 (M.D. La. Aug. 14, 2014)(finding that "Clark's 'evidence' amounts to self-serving deposition testimony and a hand drawn picture" and concluding Clark has failed to meet her burden of proof and granting summary judgment to Circle K); *Scott v. Harris*, 550 U.S. 372, (2007)(Opining that while it is the norm in summary judgment to adopt the plaintiff's version of the facts when there is a genuine dispute as to those facts, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment," and finding lower courts were wrong to accept plaintiff's version of facts that was contradicted by a videotape of the chase and crash).

Graham observes that although Chase has four options for responding to misconduct by an employee (coaching or counseling; written warnings; restrictions; and abbreviated action in

immediate termination[18]), Kurosky recommended the harshest, dismissal,[19] which Plaintiff claims was based on race and, at the very least, was a motivating factor for her discharge. Graham points out that in her deposition Kurosky stated that Graham had never been reprimanded, written up, put on a performance plan or disciplined in any way until the recommendation for termination and that she was meeting all expectations in performing her job duties, #25-5, Ex. 4 at pp. 73:4-16, 74:11-25, 76:1-10.[20]

Regarding her claims of invasion of privacy, Graham cites to *Coalition for an Airline Passengers' Bill of Rights v. Delta Air Lines*, 693 F. Supp. 2d 667 (S.D. Tex. 2010), in which Plaintiffs the Coalition for an Airline Passengers' Bill of Rights, a/k/a Flyersrights.org ("Flyersrights"), and Kathleen Hanni ("Hanni"), executive director of Flyersrights, alleged that Delta Air Lines invaded plaintiff's privacy by hacking emails and computer files from Hanni's personal computer while she was exchanging information with Frederick Foreman, president of an engineering firm working for Metron Aviation, Inc., about airport surface delays. In reviewing a motion for judgment on the pleadings, Judge Lake found that hacking into a person's private computer and appropriating a person's personal correspondences would constitute an intentional intrusion into a victim's private affairs and would be highly offensive to a reasonable

---

[18] Roberts Dep., #25-11, Ex. 10 at p. 105:1-23.

[19] The Court observes that Kurosky testified that the four options were not progressive, did not have to be followed in order, that the decision of the type or corrective action depended on the nature of the violation of the Conduct Code and that an employee could just be fired. #25-5, Ex. 4, at pp. 139:17-141:25. Kurosky further stated that the decision would be made by the managers and Human Resources and that she did not participate in the decision about Graham. *Id.* at pp. 142, l.8-143:3. When asked if every Code of Conduct violation required immediate termination, Kurosky responded that she could not think of one that would not. *Id.* at pp. 143:11-144:3.

[20] The Court notes that Chase contends that Graham was discharged not for deficiencies in her work performance, but for violations of two provisions of the Code of Conduct.

person, giving rise to a cause of action for invasion of privacy by intrusion on seclusion, and identified as the key issue whether the facts alleged by plaintiffs would allow a reasonable factfinder to conclude that Delta Air Lines did actually appropriate Hanni's emails and documents.  *Id.* at 675.  He found there was a genuine dispute about material facts as to how Metron came to possess the emails.[21]

Graham also cites *Bray v. The Cadle Company*, Civ. A. No. 4:09-cv-663, 2010 WL 4053794 (S.D. Tex. Oct. 14, 2010), in which the plaintiff contended that the defendant invaded his privacy by using the services of bank account search firms to obtain information about his financial transactions from his bank records.  Judge Keith Ellison ruled that "there need not be a physical intrusion to state a claim for intrusion on seclusion under Texas law and that the allegations that defendants "intruded on his privacy by hiring people to obtain his bank account information and to surveil" him, in essence "plausibly allege that Defendants intentionally intruded upon his seclusion by eavesdropping," and thus stated a claim for invasion of privacy. 2010 WL 4053794  at *16, 17.[22]  Judge Ellison recognized that "there is authority to the effect that examining a person's bank records can constitute an 'intrusion' for purposes of this tort." *Id. at *16, citing Restatement (Second) of Torts* § 652B, Comment b (1977)("The invasion . . . may be by some other form of investigation or examination into his private concerns, as by

---

[21] Distinguishing the situation in this suit, Chase points out that there is no allegation here that Chase hacked into Graham's personal computer or email account to access personal information. Furthermore the records at issue here were Chase's own bank records and Graham was a Chase bank customer.  Once her account was flagged by Chase's internal processes, under both federal and state law Chase was entitled to review and monitor its own records for suspicious activity associated with Graham's account.  Thus this intrusion on seclusion claim fails as a matter of law.

[22] Chase points out that *Bray* is inapposite here because it did not involve an employer that monitored its own company records to investigate suspected employee misconduct, but instead dealt with a third party (non-bank) debt collector that hired external bank account search firms to obtain the plaintiff's bank records and surveil the plaintiff.

opening his private and personal mail, search his safe or his wallet, [or] examining his private bank account . . . .").[23]

Graham argues that here, too, Chase appropriated her personal information, accessed her bank account through its AML unit's investigation, undertaken after discovery of some wire transfers between her account and that of another Chase  customer, without Graham's knowledge.  Ex. 2, Graham's Dep., pp. 188:14-18, 39:11-19; Ex. 3, Plaintiff's Journal, Ex. 5, Turner Dep. at pp. 50:18-25, 51:1-10; Ex. 6, Turner Investigation Notes.  Approximately four months later AML informed Chase's GS&I to further investigate whether Graham had violated any Code of Conduct policies, again without informing her.  Thus for five or six months AML and GS&I surreptitiously investigated Graham's personal bank accounts, statements, records,

---

[23] In complete form, § 652B states,

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man.

Comment:

> a. The form of invasion covered by this Section does not depend upon any publicity given to the person whose interest in invaded or to his affairs.  It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.
> b.  The invasion may be by physical intrusion.  It may also be by use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.  It may be by some other form of investigation, or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.  The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.

and credit record at American Express and contacted third-party entities to access her private information without her permission, causing her severe mental anguish, lost wages, loss of earning capacity and a tarnished reputation.  A reasonable person could infer that a genuine issue of material fact exists to support her claim of intrusion on her seclusion.

Finally Graham contends that she suffered severe emotional distress as a result of Chase's racial discrimination, harassment, retaliation, and invasion of her privacy.  She was berated, humiliated, and had her good name tainted in the banking industry.  Ex. 2, Graham Dep. at pp. 206:16-25, 207:1-10.  She testified that she takes Lorazepam to help with her fear and anxiety.

In sum, because genuine issues of material fact exist, Graham maintains that Chase is not entitled to summary judgment as a matter of law.

### Chase's Reply (#26)

Contending that Graham's response merely repeats her conclusory opinions and subjective perceptions about her employment at Chase, Chase reiterates and emphasizes Graham's failure to address the following of Chase's arguments about the factual and legal deficiencies of her claims:

(1) Even if taken as true, her allegations about Kurosky's offhand comments about the value of Graham's belongings or her actions in cutting  Graham off twice in meetings are not based on race and are not sufficient to be considered "severe," "persuasive," or "motivated by race" under the well established law governing hostile work environment claims,[24] nor are they ultimate employment

---

[24] *See, e.g., Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)(holding that a supervisor's infrequent and isolated comments directed to plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level  of severe or pervasive

actions;

(2) Undisputed evidence shows that Kurosky, the only person against whom she alleges discriminatory animus, did not make the decision to investigate her and/or ultimately terminate her employment;

(3) Graham's failure to exhaust administrative remedies regarding her retaliation claim bars it as a matter of law;

(4) Her retaliation claim fails because Graham did not allege that she engaged in any protected activity[25];

(5) Chase did not "make public" any statements about her, and its communications with the TWC are qualifiedly privileged;

(6) Chase's actions in investigating her violations of its Code of Conduct during her employment do not constitute an intrusion on seclusion because she has no legitimate expectation of privacy in Chase's own bank records, especially once her account was flagged by its AML group, and its conduct in reviewing these statements cannot be deemed highly offensive; and

(7) She suffered no damages resulting from Chase's alleged violation of her privacy.

As for Graham's meritless objections to Chase's summary judgment motion and exhibits, the only evidence she has to support her claims is her journal, which is inadmissible, unauthenticated, self-serving, hearsay evidence.  In sum, insists Chase, all Plaintiff's claims fail

---

harassment).

[25] See Graham's Dep., #24-3, Ex. B. at pp. 189:18-190:3, admitting she never made a complaint, an outward protest or statement that she felt, observed, experienced discriminatory behavior "because I did not want to lose my job."

as a matter of law and should be dismissed.

Graham fails to state a *prima facie* case of race discrimination because she has no evidence that a similarly situated employee outside of her protected class was treated more favorably than she was (i.e., a non-African-American employee engaged in outside business activities and/or involved in personal transactions with a Chase customer was not terminated by Chase for violations of its Code of Conduct).  Nor can she show that she was replaced by an individual outside of her protected class since she was replaced by two African American female employees.  Ex. J

Moreover Chase has shown that it had a legitimate, nondiscriminatory, nonretaliatory reason, her violations of the Code of Conduct, for terminating Graham's employment, and Graham has no evidence that Chase's reason was pretextual.

Regarding Plaintiff's claim of public disclosure of private facts, Chase has also shown that it made no publication because it did not communicate Plaintiff's personal information to the public at large or disseminate to so many people that it became public knowledge.  Moreover it has proven that its communications with the TWC are qualifiedly privileged and Graham has not shown that it acted in bad faith in disclosing the information to the agency.  As for any damages that Graham claims she suffered because of alleged communication, she has no evidence to support such relief.  *See Miller v, Raytheon Co.*, 716 F.3d 138, 147 (5th Cir. 2012)(for damages for emotional harm, including mental anguish, "a plaintiff's conclusory statements that he suffered emotional harm are insufficient" and he must have "specific [medical or psychological] evidence of the nature and extent of the harm"; also finding "the Millers' self-serving testimony is legally insufficient.").

About Graham's cause of action for intrusion on seclusion, Chase argues that there is no

intrusion where there is no expectation of privacy.  *Vaughn v. Drennon*, 202 S.W. 3d 308, 320 (Tex. app.-Tyler 2006, no pet.); *Smith v. Methodist Hospitals of Dallas*, No. 3:07-CV-1230-P, 2008 WL 5336342, at 86 (N.D. Tex. Dec. 18, 2008).  Graham testified that she understood that if Chase "had cause" to look at an account, such as when it was flagged by Chase's investigatory units, it may examine and monitor the account.  #24-3, Ex. B, Graham Dep. at pp. 194:10-196:6. Thus she admitted that she had no reasonable expectation of privacy in her account information once her account was flagged by AML of suspicious activity.  Thus her claim for intrusion on seclusion based on her bank account fails as a matter of law.  So, too, does her claim about information regarding her American Express transactions gained by deception or false identity because she has no evidence other than her personal speculation that Chase employed misrepresentation to obtain the information.  *See Robyn v. Phillips Petroleum Co.*, 774 F. Supp. 587 (D. Colo. 1991).

### Court's Ruling

The Court agrees with Chase that all of Graham's claims fail as a matter of law.

Graham fails to make a *prima facie* case of Title VII disparate-treatment, race-discrimination claims, and claims for race discrimination under § 1981 and the TCHRA. Because she has no direct evidence of race discrimination, the *McDonnell Douglas* burden shifting framework applies here.  Plaintiff has not shown and cannot show that any similarly situated non-African Americans were treated more favorably than she was or that she was replaced by someone outside her protected class.  Moreover the conduct and/or comments by Kurosky and Chase of which she complains do not constitute adverse employment decisions or actions as a matter of law.  Even if she could make a *prima facie* case, Chase has more than met its burden to articulate a legitimate reason for her termination.  Chase has established with

substantia proof that it discharge her based on her violations of the Code of Conduct when she engaged in outside business activities in helping her husband with the Colbert-Ball tax franchises by doing the accounting and in conducting multiple large transactions with Chase customer Monica Colbert d/b/a ASK.  In turn Graham has failed to show that these reasons were pretextual or that she was also terminated for a separate racially based reason.

The Court lacks federal subject matter jurisdiction over Graham's retaliation claim under both Title VII and the TCHRA because she failed to exhaust her remedies regarding that claim. Even if the Court could rule on this point, Chase has shown that Graham never demonstrated that she engaged in a "protected activity" before her discharge and filing of a charge of discrimination or proceeding to recover unpaid wages.  Although § 1981 has no exhaustion of remedies requirement, she also has not shown a causal link between a protected activity and her discharge.  If she claims that her post-discharge attempt to recover her unpaid bonus was denied because she challenged her termination, she failed to show such a causal link.  Moreover because the TWC's appeal tribunal ruled in her favor over the unpaid bonus issue, she has no damages.

Graham's hostile work environment claim under all three statutes also fails.  Her complaints that Kurosky cut her off in front of her peers, made comments about her expensive cars and handbags, took her to be interviewed by an investigator in a building where people knew her, or failed to acknowledge her performance success do not separately or cumulatively constitute the kind of sever or pervasive  intimidation, ridicule, and insult sufficient to establish a hostile work environment, nor do they alter the conditions of her employment so as to destroy her opportunity to succeed in the workplace.  More fundamental, she does not show they were race-based by any objective standard.

The Court further agrees with Chase that Graham fails to establish that Chase made a

publication of her private finances under the meaning of that term, i.e., a matter communicated to the public at large to that it becomes a matter of public knowledge for her invasion of privacy disclosure of private matters claim.  The Court also concurs with Chase that its communication with the TWC regarding her charge of discriminatory discharge and retaliation was qualifiedly privileged as a matter of law.  Nor did Graham show that Chase obtained her American Express credit card information by any kind of deception.

Graham's claim of intrusion on seclusion fails as a matter of law because she presented no evidence that Chase physically invaded her property or obtained her private information by eavesdropping, wiretaps or spying.

For both types of invasion of privacy claims fail because Graham admits that the TWC never received her private information, nor does she demonstrate that anyone else did, so she cannot show any damages.

Finally, none of the conduct or comments that she complains of is so extreme and outrageous as "to go beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized community."  *Twyman*, 855 S.W. 2d at 621.  Thus her claim of intentional infliction of emotional distress fails also.

Accordingly, the Court

ORDERS that Chase's motion for summary judgment is GRANTED.  A final judgment will issue by separate order.

SIGNED at Houston, Texas, this 17th day of July, 2015.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE